Andrew N. Friedman (DC Bar 375595)
Victoria S. Nugent (DC Bar 470800)
Julie Selesnick (DC Bar 485558)
Geoffrey Graber (*pro hac vice forthcoming*)
Eric Kafka (*pro hac vice forthcoming*)
Karina G. Puttieva (*pro hac vice forthcoming*)
Paul Stephan (*pro hac vice forthcoming*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
vnugent@cohenmilstein.com
jselesnick@cohenmilstein.com
ggraber@cohenmilstein.com
ekafka@cohenmilstein.com
kputtieva@cohenmilstein.com
pstephan@cohenmilstein.com
*Counsel for Plaintiff*

Eric H. Gibbs (*pro hac vice forthcoming*)
ehg@classlawgroup.com
Andre M. Mura (DC Bar 492837)
amm@classlawgroup.com
Karen Barth Menzies (*pro hac vice forthcoming*)
kbm@classlawgroup.com
Amy M. Zeman (*pro hac vice forthcoming*)
amz@classlawgroup.com
Steve Lopez (*pro hac vice forthcoming*)
sal@classlawgroup.com
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTRAL RESTO, LLC D/B/A CENTRAL MICHEL RICHARD,<br>1001 Pennsylvania Avenue NW<br>Washington DC 20004,<br><br>    Plaintiff,<br><br>v.<br><br>TRAVELERS INDEMNITY COMPANY OF AMERICA,<br>1 Tower Square<br>Hartford, CT 06183,<br><br>    Defendant. | Civil Action No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>(1) Declaratory Judgment<br>(2) Breach of Contract<br>(3) Breach of Implied Covenant of Good Faith and Fair Dealing<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiff Central Resto, LLC d/b/a Central Michel Richard ("Central"), hereby files suit against Travelers Indemnity Company of America ("Travelers") and alleges the following.

**INTRODUCTION**

1. Governments around the world have enacted stringent countermeasures in order to combat the COVID-19 pandemic, requiring the closure of many businesses and restricting almost all public activities.

2. Restaurants, in particular, have suffered immediate and precipitous losses. This impact on restaurants will have a devastating impact on the nation's economy and social life. As of 2016, Americans spend more than half of their food budget eating outside the home. According to The Brookings Institution, food preparation and service is the second most common occupation in the United States; waiting tables is the eighth most common. At the start of 2020, there were more than 12 million Americans working at over 600,000 food service and drinking establishments nationwide. *Food & Wine* reports that approximately 8 million restaurant workers have been laid-off or furloughed since mid-March. Before the COVID-19 pandemic materialized, the National Restaurant Association predicted 2020 sales would be $899 billion. As of June 15, 2020, the Association's research shows that restaurants lost $120 billion in sales during the first three months of the COVID-19 pandemic. The outlook is dire for the tens of thousands of restaurants that may never reopen.

3. Central bought full-spectrum, comprehensive insurance to protect all aspects of the insured businesses – not just for damage to insured premises and equipment – but also for interruptions in business operations that result in loss of business income. Central believed that it had purchased comprehensive coverage that would apply to business interruptions under

Case 1:20-cv-02060   Document 1   Filed 07/29/20   Page 3 of 19

circumstances like this, where Plaintiff has done everything right to protect its businesses and the public. Such coverage is important, if not vital, because profit margins in the restaurant industry are slim and, unlike in the insurance industry, reserve funds tend to be low. Hence, business interruptions are a particular concern of this industry.

4. Travelers, from whom Plaintiff purchased such insurance, swiftly denied the claim. Though its reasons are cursory, the denial appears to be based on an unreasonable reading of its policy, which tracks form policies issued by Defendant on a take-it-or-leave-it basis. Defendant denied the claim despite having pocketed significant premiums for the many policies it has issued to Central over the years. Plaintiff has been purchasing comprehensive business insurance from Travelers for many years; the provisional premium for the policy that was in effect when Central made its claim was $28,109.00.

5. This denial leaves Central financially insecure and, depending on the length of the crisis, threatens Central's very survival.

6. Plaintiff thus brings this action seeking declaratory relief and damages.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because Plaintiff and Defendant are citizens of different states and Plaintiff seeks declaratory relief and damages valued in excess of $75,000.

8. This Court has personal jurisdiction over Travelers, because Travelers conducts business in Washington, DC.

9. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the instant action occurred in Washington, DC.

**PARTIES**

10. Plaintiff Central Resto, LLC d/b/a Central, is a limited liability company, formed under the laws of the District of Columbia in August 2005. Central, located at 1001 Pennsylvania Avenue NW, Washington, DC 20004, opened for business on December 31, 2006.

11. Defendant Travelers Indemnity Company of America, a corporation organized under the laws of Connecticut, with its principal place of business in Hartford, Connecticut, is a business which, at all relevant times to this instant action, operated in Washington, DC.

**FACTUAL BACKGROUND**

**I.    THE ONSET OF THE COVID-19 PANDEMIC**

12. In January 2020 early media reports documented an outbreak of a novel strain of coronavirus – COVID-19 – in Wuhan, China. By late January, it was generally understood in the scientific and public health communities that COVID-19 was spreading through human-to-human transmission and could be transmitted by asymptomatic carriers.

13. On January 30, 2020, reports of the spread of COVID-19 outside China prompted the World Health Organization to declare the COVID-19 outbreak a "Public Health Emergency of International Concern."

14. On March 11, the World Health Organization declared COVID-19 a global health pandemic based on existing and projected infection and death rates and concerns about the speed of transmission and ultimate reach of this virus.

15. Public health officials have recognized for decades that non-pharmaceutical interventions (NPIs) can slow and stop the transmission of certain diseases. Among these are screening and testing of potentially infected persons; contact tracing and quarantining infected persons; personal protection and prevention; and social distancing. Social distancing is the maintenance of physical space between people. Social distancing can be limited – *e.g.*, reducing

4

certain types of conduct or activities like hand-shaking – or large-scale – *e.g.*, restricting the movements of the total population.

16. A lack of central planning, shortages of key medical supplies and equipment, and the unfortunate spread of misinformation and disinformation about the risks of COVID-19 has led to widespread confusion, unrest, and uncertainty regarding the likely trajectory of this pandemic and the appropriate counter-measures necessary to mitigate the damage it could potentially cause.

17. Beginning in late February, public health officials began advising various governments around the world that one of the most disruptive NPIs – population-wide social distancing – was needed to mitigate the transmission of COVID-19. Suddenly densely occupied spaces, heavily traveled spaces, and frequently visited spaces such as schools, offices, public transit, restaurants, and shops were likely to become hot-spots for local transmission of COVID-19. By mid-March, that advice was being implemented by state and local governments across the United States, including in the District of Columbia, which issued a series of orders ("Public Health Orders") placing significant limitations on public activities and private gatherings to limit the spread of COVID-19.

## II. PUBLIC HEALTH ORDERS AFFECTING CENTRAL

18. These Public Health Orders were not implemented to prevent the contamination of Central's premises with coronavirus. They were implemented to lessen the burden on health care services and critical infrastructure in the District of Columbia and the greater metropolitan area so that these systems would not be overwhelmed. By mid-March, experts and commentators had concluded that, "our hope of stopping the disease in its tracks has ended. Our main goal now

is to prevent a huge spike in cases, or 'flatten the curve.'"[1] "Flattening the curve" was a strategy implemented not in response to the virus itself, but rather in response to the limits of the health care system. As explained at the time Public Health Orders were first issued:

> In epidemiology, the concept of slowing a virus's spread so that fewer people need to seek treatment at any given time is known as "flattening the curve." The faster and the more sharply the infection curve rises, the more quickly Washington, DC's health care system will be stressed, to the point that it may become overloaded beyond its capacity to treat severely sick patients. *"Flattening the curve" is not expected to greatly reduce the total number of people that will become infected with COVID-19, but those infections will take place over a longer period of time, which will result in a less stressed health care system, and in turn, better patient outcomes*.

Mayor's Order 2020-053 at 2[2] (Mar. 24, 2020) (emphasis added).

19. The Public Health Orders initially resulted in the complete closure of Central. It did re-open for carryout and delivery business as allowed under Phase I, and progressively re-opened exterior-only seating and then interior seating at 50% capacity when permitted by law under Phase II. On or about July 18, 2020, Central closed for the remainder of the summer and will re-open when and if permitted by Public Health Orders based on the return of its customer base to the central business district.

20. Beginning in March 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued a series of Public Health Orders which, to comply with, many DC businesses, including Central and the surrounding businesses, were forced to abandon their property and suspend ordinary business activity.

21. On March 11, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Orders 2020-045 and 2020-046, which declared a public emergency and a

---

[1] Sean Illing, *How Bad Could the Coronavirus Get in the US? I Asked an Expert*, Vox (Mar. 12, 2020), https://www.vox.com/2020/3/12/21171505/coronavirus-covid-19-outbreak-containment.

[2] https://tinyurl.com/yy7v2zky.

public health emergency in the District of Columbia. These Orders went into effect immediately and were to remain in effect until at least March 26.

22. On March 16, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-048. The Order prohibited gatherings of more than fifty people. It also prohibited table seating at any restaurant in the District of Columbia beginning at 10:00 pm that night until April 1, 2020 at 6:00 am. Order 2020-048 stated that violators would be subject to criminal, civil, and administrative penalties, including summary suspension of licensure. The Order went into effect immediately and was to remain in effect at least through March 31, 2020.

23. On March 20, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-051, which extended the specific prohibition of gatherings of more than fifty persons and table seating at restaurants and, in addition, specifically prohibited service to standing customers. Order 2020-051 stated that violators would be subject to criminal, civil, and administrative penalties, including summary suspension of licensure. This Order went into effect immediately and was to remain in effect at least through April 24, 2020.

24. On March 24, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-053, which prohibited large gatherings of ten or more people, mandated closure of all on-site operations of non-essential businesses, and specifically limited restaurants to delivery, carry out, and "grab and go" service only. Order 2020-053 stated that violators would be subject to criminal, civil, and administrative penalties, including summary suspension or revocation of licensure. This Order went into effect at 10:00 p.m. on March 25, 2020 and was set to remain in effect at least through April 24, 2020.

25. On March 30, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-054, a Stay-At-Home Order, ordering all individuals living in Washington, DC, to stay at their place of residence, except to obtain food and essential household goods or to engage in Essential Business Activities. The Stay-At-Home Order stated that violators would be subject to criminal, civil, and administrative penalties, including summary suspension or revocation of licensure. This Order went into effect at 12:01 a.m. on April 1, 2020 and was set to remain in effect through at least April 24, 2020.

26. On April 8, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-058, which mandated that all restaurants mark six foot distances outside and within their location to manage lines of customers and adopt social distancing requirements similar to those imposed on grocery stores and other retail food sellers, such as maintaining a minimum distance of six feet from each person who is not part of the same household. This Order went into effect at 12:01 a.m. on April 9, 2020 and was set to remain in effect at least through April 24, 2020.

27. On April 15, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-063, which extended Order 2020-053 and the Stay-At-Home Order (Order 2020-054) until May 15, 2020. Order 2020-063 also extended the public emergency and public health emergency in the District of Columbia until May 15, 2020. Order 2020-063 stated that violators would be subject to criminal, civil, and administrative penalties, including summary suspension or revocation of licensure, and specified that individuals "should call 311 to report any suspected violations of this or other Mayor's Orders related to the COVID-19 public health emergency." This Order went into effect at 12:01 a.m. on April 17, 2020 and was set to remain in effect at least through May 15, 2020.

28. On May 13, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-066, which extended the public emergency and public health emergency (declared by Orders 2020-045 and 2020-046, respectively) and all previous COVID-19-related orders through June 8, 2020. This Order also required masks to be worn by employees, independent contractors, customers, and visitors of essential businesses and others, and it continued to prohibit large gatherings of more than ten individuals. Order 2020-066 stated that violators would be subject to criminal, civil, and administrative penalties, including summary suspension or revocation of licensure, and instructed individuals to call 311 to report violations. This Order went into effect at 12:01 a.m. on May 16, 2020 and was set to remain in effect at least through June 8, 2020.

29. On May 27, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-067, which declared the District to be in Phase One of reopening and lifted the Stay-At-Home Order. The Order continued to require mask wearing and social distancing and to prohibit large gatherings of more than ten individuals. It allowed restaurants and other licensed food establishments to open for outdoor dining, subject to conditions including that tables seat no more than six individuals and that tables be at least six feet apart. Order 2020-067 extended the public emergency and public health emergency (declared by Orders 2020-045 and 2020-046, respectively) through July 24, 2020, and extended all previous COVID-19-related orders unless otherwise modified or superseded. The Order stated that violators would be subject to criminal, civil, and administrative penalties, including summary suspension or revocation of licensure, and instructed individuals to call 311 to report violations. This Order went into effect at 12:01 a.m. on May 29, 2020.

30. On June 19, 2020, the District of Columbia, through the Office of the Mayor

Muriel Bowser, issued Order 2020-075, which declared the District to be in Phase Two of reopening. The Order continued to require mask wearing and social distancing. It replaced the prohibition on large gatherings of more than ten individuals with a prohibition on large gatherings of more than fifty individuals. The Order permitted licensed food establishments to open for indoor dining, subject to conditions including that the establishment remain at or below 50% of occupancy, that tables seat no more than six individuals or allow for six feet between groups, that tables be at least six feet apart, that bar seating be prohibited if a bartender is working there, that indoor queuing is not allowed, and that patrons queuing outdoors be separated by at least six feet. Order 2020-075 stated that violators would be subject to criminal, civil, and administrative penalties, including summary suspension or revocation of licensure, and instructed individuals to call 311 to report violations. This Order went into effect at 12:01 a.m. on June 22, 2020 and remains effective for the duration of public health emergency.

## PLAINTIFF'S EXPERIENCE

31. Central is located in the heart of downtown Washington, DC. Opened on December 31, 2006, Central is a modern American bistro with a French twist. Central has experienced tremendous success and recognition since it opened hosting notables from the worlds of business, politics, and the arts. Michel Richard, the late founder of Central, is a recipient of the Nation's highest culinary awards, including winner of the 2007 James Beard Foundation Award for Outstanding Chef. Central was given the 2008 James Beard Foundation Award for Best New Restaurant in the US, was selected as Power Spot of the Year in 2008 and 2009 by the Restaurant Association Metropolitan Washington (RAMMY Awards), and had multiple listings on The Washingtonian's 100 Very Best Restaurants list.

32. Central is owned by a group of people and, since the death of its founder Michel Richard in 2016, has been managed by a team of his former colleagues including Central's former executive chef, David Deshaies, who was Chef Richard's longest serving protégé.

33. Central has complied with all the District's Public Health Orders and was forced to close its doors as a result of those Orders.

34. These business interruptions have caused direct loss of Central's insured property in that the restaurant and its equipment, furnishings, and other business personal property has been made unavailable, inoperable, useless, and uninhabitable, and its functionality has been severely reduced if not eliminated. The impact of the Public Health Orders is felt not simply in their direct application to Central's operations, but also in their application to the businesses and properties surrounding Central's restaurant in downtown Washington DC which are also subject to the Public Health Orders. As a result of these losses, Central's business income diminished precipitously and as of this filing has ceased entirely.

35. Central employed 65 full time staff living in DC, Maryland and Virginia, just before the Public Health Orders resulted in the closure of Central. As of this filing, all but two (2) employees have been laid off. The business income coverage Central purchased from Travelers covers normal payroll expenses. It also covers the ordinary operating expenses that Central has continued to pay monthly, including rent and utility payments.

36. Even as some jurisdictions have begun to rescind or revise their Public Health Orders to allow for more business to be conducted, Central is likely to experience ongoing restrictions and residual effects, given that the pandemic spread still remains uncontrolled and densely occupied public spaces remain unsafe as places where the risk of transmission remains high.

37. Central purchased a comprehensive commercial liability and property insurance policy from Travelers – with effective dates of December 1, 2019 to December 1, 2020 (the "Policy") – to insure against all of the risks Central might face, including those risks that might cause interruptions to the restaurant's operations and result in lost business income.

38. Central is managed by savvy food and beverage professionals who excel at operating restaurants, not risk assessment professionals aware of every possible catastrophe which could cause the restaurant to close. In its dealings with Travelers, Central was a consumer, and what it cared about was being covered by insurance under any circumstances which might cause it to close. Travelers, on the other hand, is in the business of predicting catastrophes and has been aware of the potential for a COVID-19-type pandemic for at least a decade.

39. There are many extensions of coverage in the Policy, including coverage for loss of business income with extra expense and coverage for business income from dependent property. Once triggered, the Policy pays actual losses sustained for the business income and extra expense coverage up to a per occurrence limit of $4,100,000. The Policy also provides "civil authority" coverage and "ingress or egress" coverage if all qualifying conditions are met.

40. The Policy was not individually negotiated. The Policy's substantive terms were set unilaterally by Travelers, were not subject to individual negotiation by Central, and were presented to Central on a "take it or leave it" basis, despite the hefty premiums charged. Subsequent amendments to the original terms – called endorsements – were also unilaterally imposed.

41. Central was never informed by Travelers that for the business income and extra expense coverage to apply, there would need to be visible physical damage to property. The Policy also does not say this anywhere, nor does it define the terms "loss" or "damage".

42. To date, Central has paid all of the premiums required by Travelers to keep its policy in full force, and has met all applicable conditions precedent in order to receive payment under the Policy and to recover the lost business income and extra expenses that have resulted from the Public Health Orders closing Central.

43. Shortly after being forced to close, Central, through its insurance broker, reported a loss of business income as of March 15, 2020,

44. On April 2, 2020, Travelers denied Central's claim for direct physical loss of property and actual loss of business income sustained during the suspension of operations as a result of the loss of the use of property. In a cursory denial letter, Travelers took the position that Central did not have business income and extra expense coverage because, in relevant part, (a) there was no direct physical loss or damage at the insured premises; (b) the endorsement titled "Exclusion of Loss Due to Virus or Bacteria" precludes coverage for "loss or damage caused by or resulting from any virus," and (c) business income losses that are caused by or result from "loss of use or loss of market", "contamination by other than 'pollutants'", and/or "acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body" are excluded from coverage under the Policy.

45. Travelers' denial letter, on information and belief, appears to be a form letter prepared to send in response to business interruption claims arising from DC's Public Health Orders by customers who purchased the same or substantially similar comprehensive business insurance policies.

46. The denial letter does not define "direct," "physical," "loss," or "damage," and the Policy does not either.

47. Traveler's denial is contrary to the terms and conditions of the Policy and

13

applicable law, which give effect to plain language, construe ambiguity in favor of coverage, and narrowly construe exclusions, the applicability of which insurers have the burden of proving.

48. Central was ordered to suspend or severely curtail business due to the various Public Health Orders, which are covered causes of loss as defined in the Policy. As a result of this, Central has suffered the physical loss of its insured real and personal property. As such, the Policy's coverage for losses to business income and extra expenses are triggered. The Policy's coverages for business income from dependent property, civil authority, contract penalties, and ingress or egress are also likely triggered.

49. Central has suffered and will continue to suffer damages due to Traveler's wrongful denial of insurance coverage, which Central acquired to sustain its business and protect its employees and the continued viability of the restaurants in circumstances such as these.

## COUNT I: DECLARATORY JUDGMENT

50. Central re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1 through 49.

51. Central purchased the Policy which provides comprehensive business insurance from Travelers.

52. Central met all or substantially all of its contractual obligations, including by paying all the premiums required by Travelers.

53. The Policy includes provisions that provide coverage for the direct physical loss of use of Central's insured premises and equipment as well as actual loss of business income and extra expenses sustained during the suspension of operations as a result of the loss of use and risk of physical loss.

54. Beginning in March 2020, state and local governments issued a series of Public Health Orders that severely restricted access to Central's business premises.

55. As a result of these Public Health Orders, Central lost the use of its business property and lost substantial business income as a result of the loss of the use of its business property.

56. These losses are insured losses under several provisions of Central's Policy, including provisions covering direct loss of property, loss of business income, extended loss of business income, and business income from dependent properties.

57. There are no applicable, enforceable exclusions or definitions in the Policy that preclude coverage for these losses.

58. Wherefore, Central seeks a declaration that its business income losses are covered and not precluded by exclusions or other limitations in the Policy.

## COUNT II: BREACH OF CONTRACT

59. Plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1 through 49.

60. Central purchased the Policy from Travelers to ensure against all risks (unless specifically excluded) its businesses might face. The Policy is a binding contract that is supposed to provide Central with comprehensive business insurance under its terms and conditions.

61. Central met all or substantially all of its contractual obligations, including by paying all the premiums required by Travelers.

62. Beginning in March 2020, state and local governments in Washington DC issued a series of Public Health Orders that severely restricted access to Central's business premises.

63. As a result of these Public Health Orders, Central lost the use of its business property and lost substantial business income as a result of the loss of the use of its business property.

64. These losses are insured losses under several provisions of Central's Policy, including provisions covering direct loss of property, loss of business income, extended loss of business income, and business income from dependent properties.

65. There are no applicable, enforceable exclusions in the Policy that preclude coverage.

66. Travelers breached the contract by denying comprehensive business insurance coverage to Central.

67. As a direct and proximate result of Traveler's denial of comprehensive business insurance coverage under the Policy, Central has suffered damages.

68. Wherefore, Central seeks a judgment that Travelers has breached its contract with Central and corresponding damages for that breach.

## COUNT III: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

69. Plaintiff re-alleges and incorporates by reference herein all the allegations contained paragraphs 1 through 49.

70. Plaintiff contracted with Defendant to provide Plaintiff with comprehensive business insurance to ensure against all risks (unless specifically excluded) a business might face.

71. This contract was subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties—both explicit and fairly implied—and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts. These included the covenants that Defendant would act fairly and in good faith in carrying out its contractual obligations to provide Central with comprehensive business insurance.

72. Travelers breached the implied covenant of good faith and fair dealing by:

(a) Selling a policy that appears to provide liberal coverage for loss of property and lost business income knowing that Defendant would interpret poorly defined terms, undefined terms, and ambiguously written exclusions to deny coverage under circumstances foreseen by Travelers but not Central;

(b) Denying coverage for loss of property and lost business income by invoking undefined, ambiguous, and contradictory terms that are inconsistent with the plain terms and purpose of the Policy;

(c) Denying Central's claims without adequate investigation or inquiry, arbitrarily and capriciously, and/or with knowledge that the denial was unreasonable under the Policy.

73. Central met all or substantially all of its contractual obligations, including by paying all the premiums required by Travelers.

74. Travelers's failure to act in good faith in providing comprehensive business insurance coverage to Central denied Central the full benefit of its bargain.

75. Accordingly, Central has been injured as a result of Travelers's breach of the covenant of good faith and fair dealing and is entitled to damages in an amount to be proven at trial.

76. Wherefore, Central seeks: (a) a judgment that Traveler's has breached the covenant of good faith and fair dealing implied in its contract with Central; and (b) corresponding damages for that breach.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff Central Resto, LLC d/b/a Central Michel Ricard requests that the Court enter a judgment awarding the following relief:

(a)  A declaration that Plaintiff's losses are covered under the Policy;

(b)  Damages;

(c)  Attorneys' fees and costs; and

(d)  Such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury in this action of all issues so triable.

July 29, 2020                                          Respectfully submitted,

*/s/ Andrew N. Friedman*
Andrew N. Friedman (DC Bar 375595)
Victoria S. Nugent (DC Bar 470800)
Julie Selesnick (DC Bar 485558)
Geoffrey Graber (*pro hac vice forthcoming*)
Eric Kafka (*pro hac vice forthcoming*)
Karina G. Puttieva (*pro hac vice forthcoming*)
Paul Stephan (*pro hac vice forthcoming*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
vnugent@cohenmilstein.com
jselesnick@cohenmilstein.com
ggraber@cohenmilstein.com
ekafka@cohenmilstein.com
kputtieva@cohenmilstein.com
pstephan@cohenmilstein.com

Eric H. Gibbs (*pro hac vice forthcoming*)
ehg@classlawgroup.com
Andre M. Mura (DC Bar 492837)
amm@classlawgroup.com
Karen Barth Menzies (*pro hac vice forthcoming*)
kbm@classlawgroup.com
Amy M. Zeman (*pro hac vice forthcoming*)

18

>amz@classlawgroup.com
>Steve Lopez (*pro hac vice forthcoming*)
>sal@classlawgroup.com
>**GIBBS LAW GROUP LLP**
>505 14th Street, Suite 1110
>Oakland, CA 94612
>Telephone: (510) 350-9700
>Facsimile: (510) 350-9701
>
>*Attorneys for Plaintiffs*